FILED
Clerk
District Court

SEP 02 2005

# United States District Court

DISTRICT OF **THE NORTHERN MARIANA ISLANDS**

For The Northern Mariana Islands
By_____
(Deputy Clerk)

In the Matter of the Seizure of

**Property described in Attachment "A"**

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

CASE NUMBER: **MC 05 - 00130**

I  **JAMES T. BARRY**  being duly sworn depose and say:

I am a(n)  **FBI Special Agent**  and have reason to believe
         Official Title

that in the District of the Northern Mariana Islands there is now concealed a certain property, namely,
**SEE ATTACHMENT "A"**

which is (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f)

concerning a violation of Title **18** United States Code, Section(s) **2314, 2421**

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

**See Attached Affidavit of FBI Special Agent James T. Barry, incorporated herein by reference.**

Continued on the attached sheet and made a part hereof.  ☒ Yes   ☐ No

Signature of Affiant
**JAMES T. BARRY**
**Federal Bureau of Investigation**

Sworn to before me, and subscribed in my presence

_September 2, 2005_   at Saipan, CNMI
Date                      City and State

HONORABLE ALEX R. MUNSON
Chief United States District Judge          Signature of Judicial Officer
Name and Title of Judicial Officer

**Attachment A**

(1) United States currency in Account # 603216342, held in the name of ZHENG, Ming Yan, Bank of Hawaii, Saipan, CNMI

(2) United States currency in Account # 03-000043, held in the name of Greate Corporation, City Trust Bank, Saipan, CNMI;

(3) 2005 Toyota Sequoia, CNMI tag # ADM-351, VIN 5TDBT44A75S238071, registered to ZHENG, Ming Yan

UNITED STATES DISTRICT COURT

NORTHERN MARIANA ISLANDS

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF )<br>)<br>(1) United States currency in )<br>Account # 6032316342, held in the name of )<br>ZHENG, Ming Yan, Bank of Hawaii, )<br>Saipan, CNMI; )<br>)<br>(2) United States currency in )<br>Account # 03-000043, held in the name of )<br>Greate Corporation, City Trust Bank, )<br>Saipan, CNMI; )<br>)<br>(3) 2005 Toyota Sequoia, CNMI tag # )<br>ADM-351, VIN 5TDBT44A75S238071, )<br>registered to ZHENG, Ming Yan. )<br>_____) | **AFFIDAVIT IN SUPPORT OF**<br>**SEIZURE WARRANTS** |

I, JAMES T. BARRY, being duly sworn and under oath, hereby depose and state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for over eight years. During my career with the FBI, I have conducted numerous investigations in Counter-terrorism, Violent Crime, White Collar Crime, and Civil Rights. I have received extensive training in a broad range of investigative matters. Prior to my employment with the FBI, I served for over nine years as a Police Officer for the City of Tampa, Florida and conducted numerous criminal investigations in that capacity. I have a Bachelor of Arts in International Studies and a Master's degree in Public Administration.

2.  I make this affidavit based on my personal knowledge and information furnished to me by other law enforcement personnel. Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I have learned during the course of my investigation. Unless otherwise indicated, all actions, statements and conversations that I have recounted in this affidavit are related in substance and in part.

### PROPERTY TO BE SEIZED

3.  This affidavit is made in support of an application for seizure warrants for the following bank accounts and car:

  a.  all currency in checking account # 6032316342, held in the name of ZHENG, Ming Yan, Bank of Hawaii, Saipan, CNMI;

  b.  all currency in checking account # 03-000043, held in the name of Greate Corporation, City Trust Bank, Saipan, CNMI; and

  c.  2005 Toyota Sequoia, CNMI tag # ADM-351, VIN 5TDBT44A75S238071, registered to ZHENG, Ming Yan.

4. There is probable cause to believe that the funds in said bank accounts were derived from proceeds traceable to violations of 18 U.S.C. §§ 2314 (interstate transportation in execution of fraud scheme) and 2421 (interstate transportation for purposes of prostitution). There is also probable cause to believe that the vehicle described above was used in furtherance of said schemes. As such, the funds in the banks and the vehicle are subject to seizure and forfeiture pursuant to 18 U.S.C. 981(a)(1)(C), as amended by the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), Pub. L. No. 106-185, 114 Stat. 202 (2000) CAFRA became effective August 23, 2000.

## JURISDICTION TO ISSUE OUT-OF-DISTRICT WARRANT

5. Section 981(b)(3) of Title 18, United States Code, as amended by CAFRA, now explicity provides jurisdiction for the issuance of seizure warrants for property located in other districts. This statute provides as follows:

> Nothwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in which a forfeiture action against the property may be filed under section 1344(b) of title 28, and may be executed in any district in which the property is found, ...

6. Issuance of the seizure warrant in this district is appropriate under the above statute, as this is the district "in which ... the acts or omissions giving rise to the forfeiture occured," 28 U.S.C. § 1355(b)(1)(A). As provided in 18 U.S.C. § 981(b)(3), the warrant may be "executed in any district in which the property is found."

## SUMMARY OF PROBABLE CAUSE

7. There is probable cause to believe that the funds in the bank accounts to be seized were obtained fraudulently and from continuing violations of the 18 U.S.C. §§ 2314 and 2421

1  and that the vehicle to be seized were used in furtherance of such violations. My belief is based
2  on the following facts.
3      8.    On June 15, 2005, I met with six employees of ZHENG, all of whom were
4  contract workers from the People's Republic of China. I had several meetings with these
5  employees since then. Because the six employees are native Chinese speakers, I used the
6  services of Mei Lynch of the U.S. Department of the Interior, Federal Ombudsman's Office, as
7  interpreter for the initial and all subsequent meetings. I learned the following:
8      a.    ZHENG, with the assistance of her boyfriend, Liu Chang Da, operates five
9  businesses in Saipan under two corporations, Great Corporation (also known as Greate
10 Corporation) and Perfect Corporation. The businesses operated under those corporate entities are
11 TEA HOUSE CLUB KARAOKE, above the 777 Poker Room, 369 NOODLE HOUSE, REAL
12 LIVE FISH RESTAURANT, CHAN MING MARKET, and GOLDEN CUT HAIR SALON, all
13 in the Garapan area of Saipan.
14     b.    One employee, Lian Wei, is from Dalian, China. She was recruited by an
15 employment agency there for a job in Saipan. She had been a physical therapist in China and
16 was told she would work as one in Saipan for $7.00/hour. She paid $1,900 to the agency and
17 arrived in Saipan on October 3, 2004.
18     c.    The day after her arrival, Lian Wei reported for her first day of work. Her
19 boss, ZHENG, told her that her job would not be as a massage therapist, but as a prostitute. Lian
20 initially refused but ZHENG told her that the only job available for her was as a prostitute. Lian
21 had no money, was concerned for her safety, and asked if she could return to China. ZHENG
22 told her the only way to make money for a ticket was through prostitution. Lian asked if the
23 agency could pay her back. ZHENG said that Lian would have to take that request up with the
24 agency in China.
25     d.    Another employee, Chi Xiumei, was also recruited by employment
26 agency in Dalian, China. She paid about $4,000 to the agency for the entry permit. She saw that
27 her permit application stated that she would work as a choreographer, although she has no
28 experience as a choreographer, but the recruiter told her that she would work as a waitress at

1  $7.00/hour. She also agreed that she would owe half of the fee, about $2,440, to ZHENG, her
2  employer in Saipan. Chi arrived on October 3, 2004. After arriving in Saipan, she found that
3  ZHENG had no use for a choreographer.
4  　　　　e.　The day after arrival, Chi reported for work at Tea House Club in
5  Garapan. Her boss, ZHENG, told her that her job would not be as a waitress, but as a prostitute.
6  She also initially refused until ZHENG told her that the only job available for her was as a
7  prostitute. CHI had no money and was concerned for her safety. She complained to ZHENG
8  that she had paid a lot of money to come to Saipan to work as a waitress. ZHENG told her that
9  prostitution was the only way to work off her debt.
10 　　　　f.　A third employee, Wei Qiuxiang, was recruited by the same
11 employment agency as Chi Xiumei and Lian Wei in Dalian, China for a job in Saipan. She paid
12 about $1,250 to the agency for the entry permit. She agreed that she would also owe about
13 $5,000 to ZHENG, her employer and had to buy her own plane ticket in Saipan. She saw that her
14 permit application stated that she would work as a purchasing agent in which she had some
15 experience, but the recruiter told her that she would work as a waitress at $7.00/hour.
16 　　　　g.　Wei Qiuxiang arrived on November 11, 2004. The next day she
17 reported for work at Tea House Club in Garapan. Her boss, ZHENG, told her that her job would
18 not be as a waitress, but as a prostitute. Initially, she refused until ZHENG told her that the only
19 job available for her was as a prostitute. WEI said she would go back to China. ZHENG refused
20 to let her go without paying the $5,000 that she owed, reminding her that she had signed a
21 contract to work off the $5,000. Wei felt she was not allowed to leave and had nowhere to go
22 and knew no one in Saipan. She knew she had to pay the money back before she could leave.
23 　　　　h.　Lian Wei, WEI Qiuxiang, and CHI Xiumei were forced to work as
24 prostitutes at the Tea House Club. They were forced to work every day, from 5:00 pm to 2:00
25 am. ZHENG told them that they had to have nicknames because she did not want their real
26 names in the books. Lian called herself "Wei Wei;" Chi called herself "Meng Xue;" and Wei
27 called herself "Jin Jin." The girls would wait inside the karaoke bar, while another employee,
28 acting as a pimp, would find customers outside and bring them in. Customers were allowed to

pick a girl; then they would go to a room in the back of the bar for sex. Some nights they would only have a few customers, some nights there were none. ZHENG would come in at the end of the night to collect that night's earnings.

      i.      All three women stayed in barracks owned by ZHENG. None of them wanted to stay, but they felt they had no choice. They were also told not to file complaints with the Department of Labor.

      j.      Lian was paid nothing for the first six months that she worked for ZHENG. ZHENG told her that her rent, the recruiter's fee, taxes, and other expenses took up all of her income for the first six months. After six months, ZHENG started paying her, but still took deductions. They were not paid by the hour. They received a portion of the money that each customer paid. She estimated that, at $7.00/hour, ZHENG owed her about $15,000.

      k.      Chi was paid nothing for the first six months that she worked for ZHENG. ZHENG's boyfriend, Liu Chang Da, yelled at her and told her that she was too ugly to make enough money to repay her debt. ZHENG took all of her pay to cover her rent, taxes, her health certificate, and other expenses. After six months, ZHENG started to pay her, but still took deductions. She is now trying to send some money back to China so her family can repay the loan she took to pay the recruiter.

      l.      Wei was also paid nothing for the first four months that she worked for ZHENG. By that time, she had worked off her debt. After four months, ZHENG started to pay her, but still took deductions. Wei said that she had never worked as a prostitute before, and had no intention to in Saipan. She estimated that ZHENG owed her about $1,000 for each month since she paid off her debt.

      9.      On or about June 24, 2005, another individual (hereinafter "CW1") had a conversation with ZHENG. During the conversation, CW1 asked ZHENG about getting girls from China. ZHENG stated that when she needs more girls, she calls the recruiter in China and requests more prostitutes. This conversation was recorded and I have reviewed a translation of this conversation.

      10.      In addition to three vehicles that were already seized, a 2003 Toyota 4-Runner,

- 6 -

1  2004 Toyota Matrix, and 1995 Ford Van, CW1, CW1's spouse and another victim have all
2  told me that ZHENG also used a 2005 Toyota Sequoia to transport Lian Wei, Wei Qiuxiang, and
3  Chi Xiumei back and forth between the barracks and karaoke club in Garapan. ZHENG had her
4  boyfriend, Liu Changda, drive them.
5      11.    I also learned the following from CW1 and CW1's spouse:
6          a.    CW1, and CW1's spouse ("spouse") had a business in China and met
7  ZHENG there in or about March, 2004. CW1 and ZHENG discussed opening a market in
8  Saipan. ZHENG offered to assist CW1 and spouse with finding a space in Saipan and the
9  paperwork necessary for the business. CW1 and spouse sold their business in China to move to
10 Saipan. ZHENG told CW1 she would need to send about $16,000: $3,800 CW1's entry permit,
11 $4,300 for spouse's permit, and the balance three months' advance rent. CW1 transferred
12 $16,000 to ZHENG in custody of ZHENG's sister.
13         b.    Spouse arrived in Saipan on or about June 16, 2004, to open a market
14 called Xing Da. ZHENG brought spouse to storefront on Beach Road in San Antonio, where
15 spouse began renovating until the owner made spouse stop because there was no lease for the
16 space. CW1 attempted to get their money back but ZHENG said that she would invest their
17 money into a foot massage parlor and adult video store, formerly known as Tao Yen Karaoke
18 ("Tao Yen"), next door to her Tea House Club karaoke club, promising thirty percent of the
19 Karaoke club's profits.
20         c.    ZHENG gave CW1 and spouse a receipt for $6,500 for the transfer of their
21 investment from the failed market to Tao Yen. CW1 (who was still in China) said that ZHENG
22 owed them an additional $8,000 from their investment in the market. ZHENG claimed that the
23 difference reflected money ZHENG spent on shelves and fixtures for the market and paid to the
24 previous owners of Tao Yen to buy out their investment.
25         d.    Spouse took over Tao Yen on or about July 21, 2004, believing all of the
26 equipment from the former karaoke club was still inside. However, CW1 and souse did not have
27 access to any money from the business. In an attempt to get the business going, spouse and
28 ZHENG's boyfriend, Liu Chang Da, went to China to buy materials to renovate the space, for

which CW1 and spouse paid. Upon their return in or about August, 2004, spouse found that ZHENG had removed and sold all of the electronics, audio-visual equipment, appliances, and furniture, except for an old television. In addition, ZHENG had closed Tao Yen, expanded Tea House karaoke into the space, using the newly purchased renovation materials, and rented the rest of the space to a beauty shop.

   e. CW1 arrived from China in or about September, 2004. When they asked ZHENG for some of their earnings from the Tea House karaoke club, ZHENG said that they would not get any return on the investment because she needed the money to recruit new girls for the karaoke club. CW1 and spouse unsuccessfully asked for their earnings again on or about September 9, 2004, and October 6, 2004, with ZHENG hitting CW1 with a chair on the latter occasion.

   f. CW1 and spouse estimate that ZHENG fraudulently obtained approximately $48,000 from them. After the closing of Tao Yen, CW1 has been assigned to menial chores like cleaning toilets. Spouse now works as a cashier, driver, and janitor for the karaoke club. ZHENG has not paid them any money since they came to Saipan. In fact, they recently paid ZHENG $900 to have their entry permits renewed.

  12. Spouse helped keep the books for ZHENG's prostitution business (originally, CW1 and spouse believed that prostitution was legal in the CNMI). ZHENG maintained ledgers with columns for girls' nicknames, how much customers spent on drinks, one-hour, two-hour, or all-night sessions with the girls, the pimp's share, each girl's share, and ZHENG's share. ZHENG's signature appears on the bottom of several pages. Later, ZHENG told spouse to come up with codes, instead of labeling the columns in the books. CW1 and spouse then suspected that prostitution was not legal in the CNMI. I have seen copies and original pages from these ledgers. The ledgers have a separate entry for every day that there are customers and ZHENG does not keep any of them at any of her businesses.

  13. Pursuant to a Federal Grand Jury subpoena served on Bank of Hawaii on August 25, 2005, I learned that ZHENG maintains a personal account at Bank of Hawaii.

  14. I learned from another witness that Greate Corporation maintains an account at

1  City Trust Bank. I confirmed with City Trust Bank that it has an account for Greate Corporation.

2      15.    ZHENG controls Greate Corporation and uses Greate Corporation to further her fraud schemes. For one example, ZHENG causes Greate Corporation to sponsor entry permits for foreign workers from China, including CW1 and spouse, for high paying jobs that do not exist. These workers typically pay ZHENG an additional fee to arrange their entry permits. For another example, ZHENG told CW1 that she would use Greate Corporation to open CW1's grocery store.

    16.    ZHENG also receives cash from her prostitution business at the karaoke club, as much as $650 per night. ZHENG picks up the cash every night. CW1 and spouse have not seen large amounts of cash at any of the businesses.

    17.    According to CW1, ZHENG recently transferred large amounts of money, in excess of $250,000, to China. According to ZHENG's statements in court, she also owns a house in China worth approximately $80,000.

    18.    Based on the foregoing, there is probable cause to believe that the funds in said bank accounts were involved in and obtained from a scheme to defraud in violation of 18 U.S.C. § 2314 and continuing violations of 18 U.S.C. § 2421. As such the funds in the said bank accounts are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

    19.    Due to the fact that electronic funds are easily moved and the fact that ZHENG is not a United States citizen, a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture. Accordingly, the Government is seeking a warrant of seizure pursuant to 21 U.S.C. § 853(f) for the aforementioned accounts.

    20.    I confirmed with the CNMI Bureau of Motor Vehicles that the vehicle that is to be seized is in fact registered to ZHENG.

    21.    Based on the foregoing, there is probable cause to believe that the said vehicle was used in furtherance of a scheme to defraud in violation of 18 U.S.C. § 2314 and continuing violations of 18 U.S.C. § 2421. As such the said vehicles are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## CONCLUSION

22.  Based on the above facts and circumstances, I believe that there is probable cause to believe that the aforementioned bank accounts contain proceeds of interstate transportation in execution of fraud scheme and/or interstate travel for purposes of prostitution, and that the aforementioned vehicle was used in furtherance of those schemes, and are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C).

Further Affiant sayeth not.

Dated this 2d day of September, 2005.

_____
JAMES T. BARRY
FBI Special Agent

**SUBSCRIBED AND SWORN** to before me this 2d day of September, 2005.

_____
ALEX R. MUNSON
United States District Judge